David L. Neale (CA Bar No. 169978, NY Bar No. DN 1948)
LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
1801 Avenue of the Stars, Suite 1120
Los Angeles, CA 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244

Attorneys for Penthouse International, Inc.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
                                                  :
In re:                                       :         Chapter 11
                                                  :
        GENERAL MEDIA, INC., *et al.*,     :         Case No. 03-15078 (SMB)
                                                  :
               Debtors.                  :         (Jointly Administered)
-----------------------------------------------------------------x

## OPPOSITION TO MOTION FOR ORDER PURSUANT TO SECTION 105 OF THE BANKRUPTCY CODE DIRECTING PAYMENT OF PLAN DEPOSIT; <u>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF</u>

Penthouse International, Inc. ("PII"), by and through its counsel, Levene, Neale, Bender, Rankin & Brill L.L.P., hereby files its opposition (the "Opposition") to the Motion for Order Pursuant to Section 105 of the Bankruptcy Code Directing Payment of Plan Deposit (the "Motion") filed by General Media, Inc., and its direct and indirect subsidiaries, General Media Art Holding, Inc., General Media Communications, Inc., General Media Entertainment, Inc., General Media (UK) Ltd., GMCI Internet Operations, Inc., GMI On-Line Ventures, Ltd., Penthouse Images Acquisitions, Ltd., and Pure Entertainment Telecommunications, Inc. (collectively, the "Debtors"). In support of its Opposition, PII respectfully represents as follows:

## MEMORANDUM OF POINTS AND AUTHORITIES

### Introduction

1. Pursuant to the Motion, the Debtors are seeking to obtain payment of a plan deposit ("the Deposit") made by PII. According to the escrow instructions that accompanied the Deposit and subsequent orders of this Court, the Deposit would be paid to the Debtors' estate in the event that the Debtors' Third Amended Joint Plan of Reorganization dated as of July 23, 2004 (the "Third Amended Plan"), as such plan may be amended or modified, was not confirmed by August 6, 2004.

2. At the August 5, 2004 hearing on the Third Amended Plan, the Court adjourned such hearing to September 14, 2004 to track with the expected hearing date on a Section 363 motion that was to be filed by the Debtors pursuant to the terms of the operative cash collateral and adequate protection stipulations. Accordingly, the September 14, 2004 was set as the "drop-dead" date for confirmation of the Third Amended Plan: If the Third Amended Plan was not confirmed on that date, then a Section 363 sale of the Debtors' assets would go forward.

3. As will be discussed below, and as was discussed in the Motion for Reconsideration of "Order Approving Under 11 U.S.C. § 1129(a) and (b) and Fed. R. Bankr. P. 3020 Confirming the Debtors' Fourth Amended Joint Plan of Reorganization" filed by PII, which is on file with the Court, the basic assumption underlying the conditions for payment of the Deposit was that the Debtors would act in good faith in seeking to obtain confirmation of the Third Amended Plan. In this case, after the August 5, 2004 hearing, that meant the Debtors would act in good faith to obtain confirmation of the Third Amended Plan at the September 14, 2004 hearing, and that the release of the Deposit would be based upon PII's wrongful failure to perform.

4. In direct contradiction to the foregoing assumption and obligation, the Debtors were forced by the majority bondholders to file a Fourth Amended Joint Plan of Reorganization (the "Fourth Plan"), which effectively foreclosed the possibility that the Third Amended Plan would be confirmed by September 14, 2004, and, in turn, that PII's obligation to pay the Deposit would be extinguished.

5. By abandoning the Third Amended Plan, filing the Fourth Amended Plan, seeking and obtaining a hearing on the Fourth Amended Plan on shortened notice, and obtaining confirmation of the Fourth Amended Plan, all to the prejudice of PII, it is improper to compel PII to release the Deposit at this time.

6. This Court of equity should deny such relief, as "he who seeks equity must do equity," <u>Cherno v. Dutch American Mercantile Corporation</u>, 353 F.2d 147, 155 (2nd Cir. 1965), and, as discussed above and further discussed below, PII has not been treated in an equitable and fair manner by the parties in this case.

7. Moreover, PII submits that the conditions for release of the Deposit were <u>not</u> met since the Third Amended Plan as modified (<u>i.e.</u>, the Fourth Amended Plan) was confirmed and consummated prior to the aforementioned September 14, 2004 hearing.

**<u>Background</u>**

8. The Debtors each filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code on August 12, 2003. Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtors are continuing to operate their businesses and manage their properties as debtors in possession. On August 22, 2003, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee").

9. On December 22, 2003, the Debtors filed their Joint Plan of Reorganization (the "Original Plan") and the disclosure statement relating thereto. Under the Original Plan, holders

of the Debtors' Senior Notes that accepted such plan would have exchanged them for one million shares of common stock of Reorganized GMI, representing 100% of the new common equity, plus up to $27 million principal amount of new seven-year notes, while holders of General Unsecured Claims, which claims aggregate approximately $10-$12 million, would have shared pro rata in $2 million in cash and $3 million principal amount of the new seven-year notes. Holders of Convenience Claims would have received the lesser of (a) $1,000 of the allowed amount of such claim or (b) 20% of the allowed amount of such claim. Under the Original Plan, all common stock and preferred stock interests would have been cancelled and holders of such interests would have received no distributions on account thereof. Under the Original Plan, majority control of the Reorganized Debtors would have been vested in PET and its affiliates, which together hold 89% of GMI's Senior Notes and PII, holder of 99.5% of GMI Common Stock, would have received no distributions on account of such stock.

10. After a hearing held on January 21, 2004, the disclosure statement in support of the Original Plan, amended and dated as of January 21, 2004 (the "Disclosure Statement"), was approved by an Order of this Bankruptcy Court as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code (the "Disclosure Statement Approval Order"). As reflected by affidavits of service on file with the Court, on or before January 27, 2004, the Debtors mailed or caused to be mailed, by first class mail, to the parties set forth in the Disclosure Statement Approval Order the solicitation packages containing copies of: (1) the Disclosure Statement Approval Order; (2) the Notice of Disclosure Statement Approval and Confirmation Hearing on the Original Plan setting forth, among other things, (a) the voting deadline for the submission of ballots to accept or reject the Original Plan, (b) the time fixed for filing objections to confirmation of the Original Plan, and (c) the time, date and place of the confirmation hearing in connection with the Original Plan; (3) the approved form of the Disclosure Statement (together

with the Original Plan annexed thereto as Exhibit "A"); and, where applicable, (4) a ballot or notice of non-voting status, to the appropriate parties.

11. On March 10, 2004, the Debtors' notice agent, The Garden City Group, Inc., filed with the Bankruptcy Court the Declaration of Jeffrey S. Stein Regarding the Methodology for the Tabulation of and Results of Voting With Respect to the Debtors' Joint Plan of Reorganization (the "GCG Declaration") attesting and certifying the method and results of the ballot tabulation for the Classes of Claims and Interests entitled to vote to accept or reject the Original Plan. As set forth in the GCG Declaration, the Original Plan was accepted by all classes entitled to vote.[1]

12. On March 3, 2004, the adjourned date for the confirmation hearing in connection with the Original Plan, the Debtors filed their First Amended Joint Plan of Reorganization (the "First Amended Plan"), which replaced the Original Plan. The First Amended Plan provided that all holders of the Senior Notes would be paid in full with post-petition interest in cash on the Effective Date, and that all allowed General Unsecured Claims would be paid in full in cash (without interest) on the later of the Effective Date and the date such claims become allowed claims. Whereas under the Original Plan, GMI preferred stock interests would have been cancelled and its holders would have received no distribution, under the First Amended Plan the preferred stock would have been reinstated and thereby rendered unimpaired. Lastly, the common stock interests (99.5% of which are owned by PII) would have been cancelled and shares of new common stock representing 100% ownership of the Reorganized Debtors would have been issued and distributed to PII in exchange for a capital contribution by PII in an amount of not less than $38 million or such additional amount as would have been required, together

---

[1] PII never conducted any discovery of the PET Parties with respect to voting matters after the ballots were submitted. Since PII ultimately sponsored a plan of reorganization that contemplated full payment to creditors, voting on the PII-sponsored plan was rendered unnecessary. 11 U.S.C. § 1126(f). Issues concerning the voting by creditors was only made relevant by the PET Parties' insistence that the Debtors seek confirmation of the Fourth Amended Plan, since there are impaired classes of creditors under that Plan.

with a proposed exit financing facility (in the maximum amount of $30 million), to fund the distributions contemplated by the First Amended Plan.

13. On or about March 11, 2004, Pet Capital Partners LLC ("PET") filed its Majority Bondholder's Plan of Reorganization (the "PET Plan"), together with an accompanying disclosure statement. However, on or about April 16, 2004, PET filed its Notice of Withdrawal of Majority Bondholder's Plan of Reorganization and Related Disclosure Statement. Acceptances of the PET Plan were never solicited or obtained. No discovery of Marc H. Bell ("Bell"), Daniel C. Staton ("Staton"), and PET (together with Bell and Staton, the "PET Parties") was conducted by PII with respect to the PET Plan.

14. On April 21, 2004, the Debtors filed the Second Amended Plan, which provided for the payment in full, plus post-petition interest, of the Senior Note Claims and payment in full of General Unsecured Claims and Convenience Claims, without interest. Under the Second Amended Plan, the preferred stock interests would have been cancelled and the holders of such interests would have received no distributions on account thereof. Lastly, the common stock interests would have been cancelled, the holders thereof would have received no distributions on account of such interests, and new shares of common stock representing 100% ownership of the Reorganized Debtors would have been issued to PII in exchange for a capital contribution by PII in an amount of not less than $38 million or such additional amount as would have been required, together with an exit financing facility (in the maximum amount of $30 million), to fund the distributions contemplated by the Second Amended Plan. A revised commitment letter for the exit financing facility was annexed as an exhibit to the Debtors' Amended Plan Supplement, dated June 29, 2004. Exhibit A to that commitment letter replaced and superceded Schedule 6.5 of the Second Amended Plan.

15. At the hearing before this Court on July 15, 2004 (the "July 15 Hearing"), the Debtors sought and obtained an adjournment of the hearing on confirmation of the Second Amended Plan in order to further amend the Debtors' proposed plan of reorganization.

16. Although the PET Parties were contractually obligated to take no direct or indirect action to hinder confirmation of the Second Amended Plan, the PET Parties, or certain of them, commenced litigation against the individual ("Molina") who had committed to provide PII with the $38 million equity capital required to satisfy the cash requirements under the Second Amended Plan. By virtue of the PET Parties' conduct, Molina withdrew his commitment to provide the equity capital required under the Second Amended Plan. Despite the PET Parties' bad faith conduct and breach of contract, PII immediately undertook to find a replacement equity participant to allow creditors to reap the benefits of the full payment provided under the Second Amended Plan.

17. On July 24, 2004, the Debtors filed their Third Amended Plan, which replaced the Second Amended Plan. The terms of the Third Amended Plan were identical to the terms of the Second Amended Plan except that under the Third Amended Plan new common stock representing 100% ownership of the Reorganized Debtors would have been issued to GMI Holdings, LLC ("GMI Holdings"), instead of to PII. GMI Holdings was an entity formed by PII and Beate Uhse, AG ("Beate Uhse"). The issuance of such shares to GMI Holdings would have been in exchange for a capital contribution by GMI Holdings to the Reorganized Debtors in an amount required, together with a $22.5 million exit financing facility, to have funded the distributions contemplated by the Third Amended Plan. The Debtors' creditors would have received identical treatment under the Third Amended Plan as they would have received under the Second Amended Plan.

18. Literally hours before the adjourned hearing on confirmation of the Third Amended Plan was to take place, Beate Uhse advised PII and the Debtors that it was not prepared to proceed with confirmation of the Third Amended Plan. As a result, the Debtors requested, and obtained, a further adjournment of the hearing to consider confirmation of the Third Amended Plan through and including August 5, 2004.

19. At the August 5, 2004 hearing (the "August 5 Hearing"), the Debtors requested and obtained a further adjournment of the hearing through and including September 14, 2004.[2] Under the terms of the PET Parties' debtor in possession financing arrangement with the Debtors, the Debtors' failure to confirm the Third Amended Plan gave the PET Parties the right to compel the Debtors to file a motion to sell the Debtors' assets pursuant to section 363 of the Bankruptcy Code. PII did not oppose such a sale, and it was PII's understanding that the Debtors would timely file a motion to sell the Debtors' assets, and that a hearing with respect to that motion (or a sale procedures motion) was also to be held on September 14, 2004.

20. In lieu of compelling the Debtors to proceed with the contemplated sale motion, the PET Parties demanded that the Debtors go forward and seek confirmation of an amended plan of reorganization based upon the terms of the PET Plan, subject to certain modifications. The PET Parties imposed an extremely short deadline upon the Debtors to propose and seek confirmation of a plan of reorganization satisfactory to the PET Parties.

21. On August 12, 2004, the Debtors filed the Fourth Amended Plan[3], which replaced the Third Amended Plan, and a hearing on confirmation of the Fourth Amended Plan was scheduled for that same date. Pursuant to the terms of the Fourth Amended Plan, inter alia, PII

---

[2] Prior to confirmation of the Fourth Amended Plan, PII was working diligently to satisfy all of the requirements for confirmation of the Third Amended Plan at the continued hearing on September 14, 2004.

[3] Although styled as the Debtor's Fourth Amended Plan, the Fourth Amended Plan was, in essence, simply a modified version of the PET Plan. PII believes that the Debtors were compelled to proceed with confirmation of the Fourth Amended Plan under an artificial time pressure created by the PET Parties and improper coercion by the PET Parties of Robert Guccione among others.

will receive no distributions on account of its stock and the PET Parties, or certain of them, are to acquire majority control of the reorganized debtors. In addition, general unsecured creditors are to share pro rata in $2 million in cash and $11 million in principal amount of new notes (the "GMI Term Loan Notes") to be issued by the reorganized debtors. The GMI Term Loan Notes are to mature seven (7) years after issuance. See Fourth Amended Plan, Article V, § 5.2.

22. On August 12, 2004, on less than 24 hours' prior notice to PII, the Court conducted a hearing to consider confirmation of the Fourth Amended Plan. At the time of the confirmation hearing, the Debtors presented certain limited evidence in support of confirmation of the Fourth Amended Plan. Prior to the August 12, 2004 hearing, neither PII nor any other party in interest was advised of the evidence to be offered by the Debtors in purported support of confirmation of the Fourth Amended Plan, nor given any opportunity to conduct discovery with respect to the matters relevant to the Court's consideration of the Fourth Amended Plan. PII's opportunity to proceed to seek confirmation of the Third Amended Plan was completely foreclosed as a result of the foregoing.

23. On August 16, 2004, this Court entered an order (the "Confirmation Order") confirming the Fourth Amended Plan. On August 24, 2004, PII filed a motion for reconsideration of the Confirmation Order, which is scheduled for hearing on September 14, 2004.

**The Deposit**

24. On or about July 15, 2004, as consideration for the agreement to adjourn the hearing on confirmation of the Third Amended Plan, PII agreed to provide the Deposit to the Debtors. This agreement was set forth on the record at the July 15 Hearing.

25. Although the Debtors correctly point out that the Deposit was non-refundable and that PII's counsel made representations to this effect at the July 15 Hearing, the Debtors ignore

9

that the basic assumption underlying the conditions for payment of the Deposit was that the Debtors would act in good faith in seeking to obtain confirmation of the Third Amended Plan, and that failure to consummate the Third Amended Plan was solely the fault of PII. See Transcript of July 15 Hearing, which is attached to the Motion as Exhibit "A," at pp. 11-13 & 17-26, wherein Debtors' counsel represents to the Court and all parties present that the Debtors' will go forward with the filing of the Third Amended Plan and seek confirmation thereof if PII timely posted the Deposit.

26. As stated by Debtors' counsel:

> MR. FEINSTEIN: I'm not going to undertake Your Honor to inform all the partied present whether or not I receive [the Deposit] by, say, noon tomorrow so they can at least have silent direction if they understand from me that I've either received or not received the [Deposit].
>
> <u>If I do, I'll expect that . . . we'll go forward with a confirmation hearing [on the Third Amended Plan].</u>

Transcript of July 15 Hearing, at p. 21, lns. 6-13 (emphasis added).

27. By email dated July 16, 2004, which is attached to the Motion as Exhibit "B," Jay Newman of Newman & Newman informed counsel for the Debtors that PII, had delivered the $1 million Deposit to his firm's escrow account and informed Debtors' counsel that the terms under which Newman & Newman could disburse those funds were set forth in a letter of the same date (the "iBill Letter," which is attached to the Motion as Exhibit "C") from PII's subsidiary Internet Billing Co. LLC ("iBill").

28. The iBill Letter confirmed that the $ 1 million Deposit had been deposited into Newman & Newman's attorney escrow account. The iBill Letter also provided that iBill was delivering to Newman & Newman an authorization to draw upon the letter of credit (the "Letter of Credit") provided as the Deposit at such time as the conditions for a draw on the Deposit were met.

29. The iBill Letter went on to provide:

> Absent an order of the Bankruptcy Court modifying the following dates, you are hereby irrevocably instructed to release the escrowed funds (being either cash or the cash proceeds from the Letter of Credit) to General Media, Inc. if: (i) the Court fails to confirm the Third Amended and Restated Plan of Reorganization of the General Media, Inc. Group, to be filed on or before July 21, 2004 with the United States Bankruptcy Court for the Southern District of New York in case number 03-15078 (SMB) <u>as such plan may be amended or modified by the debtor</u> up to and including the time for or during the hearing on confirmation of such plan on July 21, 2004 (the "Plan") or; (ii) the effective date (as such date is defined in the Plan) of the Plan does not occur by August 6, 2004. You are also hereby irrevocably instructed to present the Letter of Credit for payment in such events.

(emphasis added)

30. At the July 15 Hearing, the Court so ordered the record such that the date for payment to the Debtors of the Deposit was extended and payment would be required in the event the Third Amended Plan was not confirmed by July 26, 2004.

31. At a hearing held on July 26, 2004, the Court so ordered the record such that the date for payment to the Debtors of the Deposit was extended and payment would be required in the event the Third Amended Plan was not confirmed by August 5, 2004, nor consummated by August 20, 2004.

32. At the August 5 Hearing, Debtors' counsel again represented to the Court and all parties present that the Debtor intended to seek confirmation of the Third Amended Plan at the September 14, 2004 hearing to avert a 363 sale of the Debtors' assets.

33. As stated by Debtors' counsel:

> MR. FEINSTEIN: We believe that there is still hope for a full payment plan.
> . . .
> So what I would like to do, Your Honor, is adjourn the third amended plan and keep working on trying to finance it, because the cornerstone of it was exit financing from Post.

> Post's counsel is in the courtroom. They had signed a commitment letter at last week's hearing. I have no reason to believe that Post has lost interest in this matter. What needs to be replaced is the equity money, and people are working fast and furious to get that done.
>
> So if we can still get to a date, the same date as a fire sale motion, if that's how this case turns out, and have a third amended plan on the calendar and have it confirmed on that date, when creditors get paid in full, then we can still snatch victory from the jaws of defeat. If we can't perform that obligation or nobody else can, then I guess we'll have a sale because the case has got to end, the company has got to get out of bankruptcy. We thought this would happen months ago, and obviously it has not.
>
> That's the Debtors' position today, Your Honor.
>
> THE COURT: So you're asking for an adjournment?
>
> MR. FEINSTEIN: Well, of the confirmation, yes, and then to extend the DIP and adequate protection stipulation, as discussed.

Transcript of August 5 Hearing (a true and correct copy of which is attached hereto as Exhibit "1"), pp. 13-15.

34. PII's counsel concurred with the foregoing request, and, in responded to the question of whether the Deposit was to be released to the Debtors, by stating the following:

> MR. NEALE: I think that the spirit and the intent of the [Deposit] that we put up was to assure the Court and to demonstrate to creditors that PII, as the [Third Amended Plan] sponsor, had every intention and was ready, willing, and able to perform. As I said, we were in a position to do so and we've done so.
>
> What I would ask is that if the Court does set a hearing on the sale motion, that the Court, as requested by Mr. Feinstein, trail the hearing on the existing [Third Amended Plan] of reorganization filed by the Debtor, sponsored by PII, supported by –
>
> (Reporter interrupted.)
>
> at that point in time. My client is working and believes that the addition of traditional equity is available and will be available at the time of a continued plan confirmation hearing. And, frankly, <u>the money isn't going anywhere</u>.

12

> . . .
> At the end of the day, if we come to a hearing and my client is able to perform, pay 100 cents on the dollar, it's a no harm/no foul situation. <u>If not, then the Court can obviously proceed with the sale motion and at that point the million dollars [i.e., the Deposit] would get released.</u>
> Under the circumstances, I don't see that there is much of a downside for creditors in any of those things. We would ask that the Court order that, [] in fact, what would happen is that the million dollars remain in escrow pending that.

Transcript of August 5 Hearing, pp. 23-24.

35. In response to the foregoing, the Court stated as follows:

> THE COURT: I'm not going to order anything with [the] million dollars [i.e., with respect to the Deposit]. I don't know that the terms of the escrow are. You'll have to deal with that.

Transcript of August 5 Hearing, pp. 24, lns. 16-19.

36. The Court concluded the August 5 Hearing by adjourning the hearing on the Third Amended Plan to September 14, 2004 to track with the expected hearing date on a Section 363 motion that was to be filed by the Debtors pursuant to the terms of the operative cash collateral and adequate protection stipulations.

37. Based on the foregoing, it was PII's belief that (i) the Debtors would go forward with confirmation of the Third Amended Plan on September 14, 2004, (ii) PII would have until that time to secure the funding required for confirmation of the Third Amended Plan, which would have extinguished PII's Deposit obligation, and (iii) in the event PII was unable to fund the Third Amended Plan on September 14, 2004, the Deposit would be released to the Debtors, absent compelling circumstances that would have relieved PII of that obligation.

### The Debtors' Demand for the Deposit

38. By letter dated August 9, 2004, which is attached to the Motion as Exhibit "D," counsel for the Debtors wrote Newman & Newman and demanded that it "relinquish to the Debtors the sum of $1 million, being the plan deposit provided by Penthouse International, Inc."

13

39. By letter dated August 10, 2004, which is attached to the Motion as Exhibit "E," counsel for PII wrote Newman & Newman and instructed "that, unless and until the Bankruptcy Court having jurisdiction over the General Media Debtors issues an order instructing you to release such deposit to the General Media Debtors, our client has instructed us to advise you not to release such funds."

**The Debtors Are Not Entitled to the Equitable Relief Requested, Because the Debtors Did Not Act Equitably; They Acted in Bad Faith.**

40. Bankruptcy courts "are courts of equity and 'appl[y] the principles and rules of equity jurisprudence.'" Young v. United States, 535 U.S. 43, 50, 122 S.Ct. 1036, 152 L.Ed.2d 79 (2002) (quoting Pepper v. Litton, 308 U.S. 295, 304, 60 S.Ct. 238, 84 L.Ed 281 (1939) (alteration in original); accord United States v. Energy Resources Co., Inc., 495 U.S. 545, 549, 110 S.Ct. 2139, 109 L.Ed.2d 580 (1990); In re Momentum Mfg. Corp., 25 F.3d 1132, 1136 (2nd Cir. 1994) (stating that bankruptcy courts are "courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process.")

41. Section 105 of the Bankruptcy Code is the primary source of the bankruptcy courts' equitable powers. See In re Dairy Mart Convenience Stores, Inc., 351 F.3d 86, 91 (2nd Cir. 2003; United States v. Energy Resources Co., Inc., supra, 495 U.S. at 549; Schwartz v. Aquatic Development Group, Inc. (In re Aquatic Development Group, Inc.), 352 F.3d 671, concurring (2nd Cir. 2003) (Straub, J., concurring opinion).

42. It is axiomatic that "he who seeks equity must do equity." Cherno v. Dutch American Mercantile Corporation, supra, 353 F.2d at 155.

43. Here, the Debtors are seeking to invoke the Court's equitable powers under Section 105 of the Bankruptcy Code to compel payment of the Deposit. However, the Debtors

have not acted equitably, so they are not entitled to the equitable remedy requested.[4] Specifically, as discussed above, the Debtors were well aware that the basic assumption underlying the conditions for payment of the Deposit was that the Debtors would act in good faith in seeking to obtain confirmation of the Third Amended Plan, and that the Deposit would be released only upon PII's inability or failure to consummate the Third Amended Plan upon confirmation. Indeed, PII would not have made the Deposit had the Debtors not been required to seek confirmation of the Third Amended Plan, for if this were not a requirement, then PII would have been consenting to the exact result that occurred here: PII makes a Deposit commitment tied to the timely confirmation of the Third Amended Plan with no obligation on the part of the Debtors to seek timely confirmation thereof, which, in effect, allowed the Debtors to abandon the Third Amended Plan without consequence and a $1 million windfall to their estates.

44.  Here, the hearing on confirmation of the Third Amended Plan was continued to September 14, 2004, and PII understood its obligation to proceed with confirmation at that time or risk losing the Deposit. PII could not have foreseen the PET Parties' ambush strategy that compelled the Debtors too seek confirmation of the Fourth Amended Plan on shortened notice. Since PII was deprived of the opportunity to perform, it is illogical and unfair to cause the release of the Deposit.

45.  As a result of the foregoing, the Court should utilize its equitable powers and deny the Motion.

### The Debtors Are Not Entitled to the Equitable Relief Requested, Because the Conditions for Release of the Deposit Were Not Met.

46.  Even if the Court finds that the Debtors were not obligated to seek confirmation of the Third Amended Plan (which they were), the Debtors are still not entitled to payment of the Deposit, because the conditions for release of the Deposit were not met.

---

[4] PII is cognizant of the fact that the Debtors' hands were tied largely by virtue of the conduct and demands of the PET Parties.

47. As discussed above, the iBill Letter, together with subsequent representations of Debtors' counsel, provided, <u>inter alia</u>, that the Deposit would only be paid to the Debtors' estate if the Court failed to confirm the Third Amended Plan, as such plan might have been amended or modified by the Debtors up to and including the time for or during the hearing on confirmation of such plan, by September 14, 2004.

48. Here, the above-delineated condition for non-payment of the Deposit occurred. That is, when the Court entered its Confirmation Order on August 16, 2004, the condition was met, because the Court confirmed the Third Amended Plan, as such plan might have been amended or modified by the debtor (<u>i.e.</u>, the Fourth Amended Plan), prior to the September 14, 2004 deadline.

## **The Motion Should Be Denied Because the Relief Requested Requires an Adversary Proceeding.**

49. Under Fed. R. Bankr. P. 7001, an adversary proceeding is required when, <u>inter alia</u>, a party seeks to recover money or property, to obtain an injunction or other equitable relief, or to obtain a declaratory judgment relating to the foregoing. Fed. R. Bankr. P. 7001(1), (7) & (9).

50. Here, the Debtor is trying to obtain one or more of the types of relief enumerated above. Accordingly, the Debtor is required to file an adversary proceeding to obtain such relief. On this basis alone, the Motion should be denied.

WHEREFORE, PII respectfully requests that the Court enter an order (i) denying the Motion; or (ii) alternatively, requiring a further evidentiary hearing with respect to the belief of the parties as to whether the Debtors were required to act in good faith in seeking to obtain confirmation of the Third Amended Plan as a condition to payment of the Deposit; and (iii) granting such other and further relief as is just and proper.

Dated: Los Angeles, California
September 9, 2004

/s/ *David L. Neale*
David L. Neale (CA Bar No. 141225,
NY Bar No. DN 1948)
LEVENE, NEALE, BENDER, RANKIN
& BRILL L.L.P.
1801 Avenue of the Stars, Suite 1120
Los Angeles, CA 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: dln@lnbrb.com